Herbert D. Stone and Ruth Stone v. Commissioner.
Stone v. Commissioner
Docket No. 44856
United States Tax Court
T.C. Memo 1954-110; 1954 Tax Ct. Memo LEXIS 130; 13 T.C.M. (CCH) 705; T.C.M. (RIA) 54216; July 30, 1954, Filed *130 Held, upon consideration of the record as a whole, that petitioners have failed to establish the theft or loss of $10,000 in currency during the taxable year in question. Murray W. Weinstein, Esq., 37 Wall Street, New York, N. Y., for the petitioner. Charles M. Greenspan, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency of $4,342.07 for the taxable year ended December 31, 1944. The only adjustment contested by petitioners is the disallowance of a deduction of $10,000 which petitioners claim to have resulted from theft or loss of currency in the above amount on April 10, 1944. Herbert D. Stone, one of the petitioners, will be referred to as the petitioner in the Findings of Fact and Opinion. Findings of Fact Petitioners filed a joint Federal income tax return for the taxable year 1944 with the collector of internal revenue for the third New York district. Petitioner is an attorney at law. Petitioner was the son-in-law of Samuel Klein, who operated a large retail department store located at Union Square and 14th Street, in New York City. Samuel Klein died on November 15, 1942. After the death of Samuel Klein, *131 petitioner was consulted by a number of distributees of the Klein Estate in regard to their rights and interests therein. The Klein Estate was administered in New York, and the parties represented by petitioner were interested in acquiring the business owned by the Estate. Petitioner organized a group, some of whom were distributees, made arrangements for loans, and, as attorney and representative of the group made an offer for the purchase of the business. Petitioner's position was that of attorney and financial advisor to the group of investors which he had organized, with whom he entered into an agreement prior to April 10, 1944, under the terms of which he was to become President of a new corporation which was to be organized to acquire the store assets of the business owned by the Estate. An arrangement was made for his salary as President. He later became President and received a substantial salary. He was personally one of the subscribers to the stock of the new corporation. It was understood that petitioner would interest other investors to participate in the purchase of the business, and that he would collect the money invested by each, and deposit it in the Midland Marine *132 Trust Company. The total sum to be raised was approximately $1,700,000, and most of it was raised within a period of about ten days. Between April 7 and April 10, 1944, petitioner collected various sums from investors, the amounts being in the form of checks. On April 10, 1944, petitioner collected additional sums, part of which consisted of checks, and the remainder in currency. The currency consisted of bills, mainly in $20 and $50 denominations but some in $100 denominations. The currency was placed in a number of ordinary correspondence envelopes which petitioner carried in several of his coat pockets. He wore a top coat on the day in question. The money in the envelopes was carried in the deep pockets and breast pocket of his top coat. Petitioner did not recall how much currency was placed in any one particular envelope. Petitioner made a number of stops to collect the funds from various subscribers. Petitioner's recollection was that his last collection stop on the day in question was at the office of David Schwartz on Broadway, near 38th Street. From there he walked across 34th Street to take a look at the B. Altman display windows. He then took the downtown subway at 34th *133 Street and Lexington Avenue. At 14th Street, he changed to an express train, which he claims was very congested. He states that he stood in the middle of the car, and was pushed back and forth. Petitioner finally left the subway train at Fulton, walked over to the branch bank, went to the executive officer of the branch (Mr. Gustave Drescher), took out the checks and the envelopes containing the currency, and turned them over to Mr. Drescher, who added them, and made out the deposit slip. Mr. Drescher eliminated one check of $80 because of some defect in the way it was drawn. The deposit totalled $76,495, of which $20,770 was in currency and the balance of $55,725 was represented by checks. Petitioner questioned the amount of the deposit, and Mr. Drescher counted it a second time, reaching the same total. Petitioner appeared to be disturbed and upset. He searched his pockets. He made statements which indicated to Mr. Drescher that he had lost a considerable sum of money, the amount of which Mr. Drescher did not recall. Mr. Drescher took from what he said that the money had been lost or stolen. On April 10, 1944, petitioner was suffering from high blood pressure and had experienced *134 loss of sleep. He was under considerable pressure in relation to the transaction with the Klein Estate. Petitioner was not compensated by insurance and received no reimbursement in any form for the alleged theft or loss of $10,000. Opinion Petitioner asserts that he either lost the sum of $10,000 in currency on April 10, 1944, or that the currency was stolen from him. He asserts that he "repaid" the $10,000 in 1944, but does not claim that he paid it to any one person. His testimony is to the effect that he repaid total sums in excess of that amount in 1944 to various persons who wanted their money back, and that from 1944 to February of 1946, he repaid money which he had borrowed in connection with the Klein transaction from Midland Marine Trust Company and Sobel and Goldman. He asserts that, in making his various payments, he necessarily repaid $10,000 more out of his own funds than he would have had to pay if the $10,000 had not been lost or stolen. He maintains that if the money was stolen, a deduction is allowable under section 23(e)(3) of the Code. If it was lost, he asserts that a deduction is allowable in the alternative, either under section 23(e)(1) as a loss incurred in *135 trade or business, or under section 23(e)(2) as a loss incurred in a transaction entered into for profit. Respondent maintains that petitioner has failed to establish that the money was either stolen or lost, but that assuming arguendo, it was stolen or lost, the loss was not deductible (a) because repayment (if it was repaid) was voluntary, without legal obligation to repay; (b) because the repayment was not an ordinary and necessary expense, and (c) because petitioner has not established repayment in the taxable year 1944. The primary question for our consideration is whether petitioner has established that the money was either stolen or lost. The question of whether or not he ever received the $10,000 is an inherent factor in the problem. Respondent disallowed the loss in his statutory notice of deficiency, and his determination is presumptively correct, placing the burden of proof upon the petitioner. It was respondent's duty to scrutinize carefully the circumstances surrounding a claim for deduction such as that before us. By its very nature there could be no express denial or refutation of the facts asserted in support of its allowance and any determination required consideration *136 of the attendant circumstances. Likewise, our own conclusions may be reached only on the basis of a meticulous examination of the whole record properly before us. Petitioner was the first witness called, and the bulk of his personal testimony was offered on April 8, 1954, the first day of the hearing. He did not testify again until May 13, the last day of the hearing, when he was recalled to rebut testimony of John W. Schaefer, who testified on May 12 and 13. The case had been reopened by consent of the parties after it had originally been concluded on April 9. In his original testimony, petitioner repeatedly turned to and referred to his "record" of payments made to him by checks between April 7 and April 10, 1944, and by checks and currency on April 10, 1944. The "record" in question is Exhibit 15. The witness repeatedly (and without objection) refreshed his recollection from this exhibit, especially with respect to the several items of currency which he claimed were paid to him on April 10 together with the names of the persons who, he claimed, made the payments, and (by penciled notations) the amounts paid by each by checks and by currency. He gave the clear impression that he *137 relied upon it as accurate, and that he himself had no independent recollection of the amounts paid to him by checks and by currency or by whom the specific amounts were paid. The record in the case shows that Exhibit 15, including the penciled notations thereon, was the only writing in his possession which furnished any basis for the information on which he relied (except the deposit slip of April 10, 1944, which showed currency or bills in an amount of $10,000 less than petitioner claimed to have received). After the testimony of Schaefer on May 12 and 13, petitioner made several material shifts of position, obviously dictated by expediency, including, for the first time, assertions that Exhibit 15 was inaccurate, when it became apparent that his original position in relation to Exhibit 15 did not serve his purpose. In view of the significance of this Exhibit, and the necessity of repeated reference to it in this opinion, we set forth herein, as Schedule A, an analysis of Exhibit 15, reflecting petitioner's original testimony, and showing the names of the contributors, the amounts alleged to have been contributed by each, and an allocation of the alleged contributions to checks and *138 cash as originally asserted by petitioner and reflected by the penciled notations. SCHEDULE A
Total Con-
Contributor
tributed
Checks
Cash
Max Tucker
$ 5,025
$ 5,025
Hary Klein
10,200
10,200
Celia Lipshitz
10,000
10,000
Fred Goldberg
10,000
10,000
Elka Balin
15,000
12,500
$ 2,500
J. W. Schaefer
15,000
15,000
Florence Stone
3,500
500
3,000
David Downs
5,000
5,000
David Schwartz
4,600
4,600
Lew Berkley
750
750
Mannie Seideman
7,500
7,500
$86,575
$55,725
$30,850
[1] *139 *140 *141 *142 *143 *144 *145 *146 *147 *148 *149 *150 *151 80
$30,770
Footnotes
1. It appears that the amount of the $80 check which Mr. Drescher had eliminated from the deposit slip of April 10, 1944, had been included in the penciled notations relating to cash on Exhibit 15. As will appear in the record in the case, the item was discussed by the Court with counsel, and appears to have no significance here material. Although petitioner, in his earlier testimony, relied upon the "record" which later became Exhibit 15, with respect to the penciled notations relating to cash, it appears that these notations were made "much later" by petitioner's secretary or accountant, he didn't know which. He asserts that he dictated the typed items at his office late on April 10, 1944, and that they were typed within a week thereafter. Since petitioner went to the bank around 1 or 1:30 p.m. before he went to his office, it is clear that the dictation must have been subsequent to the episode at the bank, and at a time when the "shortage" should have been uppermost in petitioner's mind. Petitioner testified that he checked with all of the contributors when he got back to his office to verify his figures. He testified twice that Elka Balin had given him $2,500 in cash and the rest in two checks, and also testified that Schaefer's $15,000 was paid to him in cash, either through Mr. Schwartz or Mr. Handmacher. (Later he settled on Handmacher.) If his check-up included a determination of the amount of currency paid by each, it must have been inaccurate, because at the hearing on May 13, he shifted to the statement that Schaefer paid only $10,000 in currency instead of $15,000 and as to Elka Balin, increased the currency from $2,500 to $7,500. If he did not check the amounts of currency, there is no support for his testimony because he admitted that he had no independent recollection thereof. The circumstances of the shift in testimony are significant. Schaefer produced a check of his corporation to petitioner for $5,000. Petitioner had never claimed that Schaefer paid him more than $15,000. At the first opportunity, petitioner changed his original statement of a payment by Schaefer of the entire $15,000 in currency to a statement that the currency paid by Schaefer was only $10,000. (It is to be noted that at this time, petitioner suggested no change of front as to the Balin currency.) Schaefer testified that he might have paid petitioner a total of more than $5,000 (and the record is susceptible of the inference that he paid a total of $15,000) but Schaefer flatly denies that any part of his contribution was paid in currency. Schaefer was not a satisfactory witness, and found it necessary to change his testimony in several respects, but petitioner has hardly been a model of consistency with respect to the Schaefer payments (or, for that matter, with respect to the Balin payments, to be discussed infra.) Moreover, if petitioner had so desired he could have produced as a witness Mr. Handmacher, who, petitioner claims, paid the Schaefer cash over to him. Petitioner states that he did not do so because he and Handmacher are not on speaking terms. Petitioner, speaking of Schwartz and Handmacher, said "When I have charged two men with conspiracy to defraud stockholders out of $2,000,000, I don't beg them to testify in a $10,000 case." Oddly enough, when testifying that Schaefer paid $15,000 to him in cash through Schwartz or Handmacher, petitioner described them only as friends of Schaefer. It was not until later that petitioner revealed that Handmacher is his brother-in-law. It was, of course, a matter of judgment for petitioner and his counsel to determine whether or not to subpoena Handmacher, but the Court cannot supply the lack of his affirmative testimony. Petitioner himself admitted that he had no independent recollection of the amount of cash paid to him on Schaefer's behalf, and, as already indicated, Schaefer emphatically denied that any of it was paid in cash. From the foregoing, our observations in relation to the Schaefer payments are as follows: (a) We cannot rely upon Exhibit 15 to establish that any particular amount of cash was paid to petitioner on behalf of Schaefer, because petitioner himself admits that the exhibit is incorrect, at least to the extent of $5,000 in the Schaefer cash and further admits that the notations concerning the Schaefer cash were made long after Schaefer's contribution; (b) petitioner has no independent recollection of the amount of cash paid to him on Schaefer's behalf, and has offered no affirmative evidence in relation thereto other than Exhibit 15 although Handmacher presumably could have supplied it; and (c) if Schaefer's testimony that nothing was paid by him or on his behalf in cash is to be accepted, the necessary inference would be that petitioner was mistaken, to the extent of exactly $10,000 as to the amount of cash turned over to him in the first place, and therefore never had the cash, and never lost it or had it stolen from him. Analysis of petitioner's testimony as to the Balin cash merely adds to the confused status of a situation which already presents confusion enough. On April 8, 1954, petitioner twice testified that Elka Balin had paid $2,500 in cash and the balance of $12,500 of her contribution by two checks, which, according to penciled notations on Exhibit 15 were in the respective amounts of $7,500 and $5,000. On one of the occasions on which petitioner referred to the $2,500 cash contribution by Elka Balin, he added that this was "according to my checkup," indicating that he had verified it. A comparison of the checks shown on Exhibit 15 (as amplified by penciled notes thereon and petitioner's original testimony) with the checks listed on the deposit slip (Exhibit 7) produces an exact tally if we attribute one check of $5,000 and one of $7,500 to Elka Balin in accordance with Exhibit 15 and petitioner's original testimony. On May 13 (some while after, on the same date, petitioner, testifying in rebuttal, had changed his testimony as to the amount of cash paid to him on Schaefer's behalf), it became apparent to petitioner that if Schaefer had paid $5,000 less cash than originally claimed, petitioner could not assert a $10,000 loss without further adjusting his figures, because there was only $5,000 of cash left, according to his original testimony, to which the loss might be attributed. He then immediately changed front and asserted that Elka Balin had contributed $7,500 in cash, rather than $2,500, according to his original testimony. It was just that simple - except that petitioner again admitted that he (and, in effect, Exhibit 15) had been wrong in the first place, and also admitted that he had no independent recollection of how much cash Elka Balin contributed. The testimony was an obvious reconstruction by the witness to fit in with his theory that he had suffered a $10,000 cash loss. Again Exhibit 15 is unreliable, and again there is no other affirmative evidence except petitioner's speculative reconstruction. Elka Balin was not called as a witness. It was explained that she was in Florida. There was no suggestion as to why her deposition had not been taken in advance of trial. Our own thought is that it never occurred to petitioner to suggest that she paid more than $2,500 in cash until the developments on May 13 left her contribution as the only source from which he could present a reasoned explanation fitting into the theory of his case. A detailed examination of the record discloses additional, though less significant, indications of the pattern of expediency which is apparent from the testimony of petitioner already discussed, but we do not consider them of sufficient moment to warrant extended analysis. We call attention to the fact that petitioner admitted that on April 10, 1944, he was under considerable pressure, was suffering with high blood pressure, and had been losing sleep. None of the several contributors of April 10, 1944, or their representatives, were produced by petitioner as witnesses. As to some he explained that they were unavailable (including Elka Balin), or could not be located, or that they were not substantial cash contributors. As to others, it was explained that they were antagonistic (including Schwartz, Handmacher, and Schaefer, the last of whom was called by respondent). No original records or notations made by petitioner were preserved or produced. Petitioner testified that in 1944 he had no familiarity with the income tax laws and that the tax significance of his loss never occurred to him until about March 1945, when his accountant advised him that he could deduct the loss. Petitioner himself called the loss to his accountant's attention. (Just why, if the tax significance had not occurred to petitioner, is not explained.) Petitioner, even beginning with March of 1945, never took any steps to locate or preserve supporting data (such as the notations he claims to have made in his checkbook) or to request that any of the contributors preserve their receipts or other records of the contributions which they had made on April 10, 1944. Petitioner explained this on the ground that he did not consider that he might be questioned or required to verify the loss. He never told any of the contributors about the loss for fear of loss of confidence in him while the Klein deal was pending, and because of possible damage to his reputation, especially in the light of previous publicity which had attended the litigation involving the Klein situation, all of which might also have affected the new corporation of which he was to be president. Except for himself, the only witness produced by petitioner was Gustave Drescher, a vice president of the Midland Marine Trust Company, and in charge of its William Street Branch. While the witness did not recall the exact date, it appears clear from the circumstances that the events concerning which he testified occurred on April 10, 1944. Mr. Drescher testified, in substance, that petitioner came to him personally, in his office, and handed him some checks and some envelopes containing currency in small bills. Mr. Drescher made out a deposit slip (Exhibit 7) showing cash in the amount of $20,770 and checks which totaled $55,725 after he had eliminated one check of $80, which was not properly made out. The full total shown on the deposit slip was $76,495. Thereafter, the testimony of the witness included the following: "Mr. Stone told me he had lost some money." "Well, he was disturbed. He searched around his pockets and said - it was evident to me, apparently, he had misplaced some money." "Stone then got a little upset and started going through his pockets. We went back and checked the envelopes that we had thrown away, and looked through them, and he said he had either been robbed or had lost the money." "How much it was, I don't know, I don't recall what the amount was. We had a disagreement as to the total of the deposits on that day." "When I said 'Mr. Stone, I have a total of so much,' he said 'No, it should be more'. I said 'Well I am sorry; that is all I have.' We recounted the cash, went over the checks. Then he got up, started to look around through his pockets, and then told me - just what he said, I don't know, but he certainly indicated very clearly that he had lost a considerable amount of money. I don't remember the amount." We have set forth in exact words the portions of the testimony of Mr. Drescher which we think have significance. We add that we are impressed with the truth of the testimony, as far as it goes. Our difficulty is that while it paints a picture, as viewed by the witness, it merely returns us to the consideration of Stone's own testimony. We think that what occurred in the episode at the bank with Mr. Drescher would have occurred in substantially the same way (a) if Stone had suffered the loss, or (b) if he hadn't suffered it, but thought he had, or (c) if the whole matter had been deliberately concocted by Stone. We note, also, that there is no suggestion in Drescher's testimony that petitioner exhibited to him any notations made that day as to the amount of cash collected either as a total, or segregated by contributors. If he had made any notations, it is not only likely that he would have used them at once to check the facts while in Drescher's office, but that he would have preserved them. If he made none, he was obviously risking the fallability of memory. The only other means by which petitioner seeks to corroborate his position is found in his testimony concerning the report of the theft or loss to the police. Petitioner testified he made a telephone call to the police station in the area in which he lived, and also went to the same police station in person, to report the circumstances. The detective in charge told him it would have to be reported to the Old Slip Station which covered the area where the loss is alleged to have occurred. Petitioner called the Old Slip Station, but was told he must appear in person. After reflection, he decided not to appear or make a formal report because he feared the attendant notoriety. No evidence was produced to show that either police station made any record or notation of his calls or visit. He did not follow up in any way through police channels. A few weeks before the trial, he made an inquiry at the police station in the area in which he lived, in an effort to locate the detective to whom he had spoken originally but was told that only three detectives who had been there in 1944 were still there, and all three were out. He did not pursue the matter further. We find no particular significance in the foregoing testimony concerning the report of the theft or loss and our comments relating to the evidence of Mr. Drescher appear equally applicable. We do not suggest, upon our analysis of the record, an inference of deliberate misstatement on the part of petitioner. We do believe, however, that a reasonable inference may be drawn from the entire record that petitioner, while under a strain and suffering from high blood pressure on April 10, 1944, may well have been mistaken about the amount of cash he had collected; that he had collected $10,000 less than he thought; and that no theft or loss occurred. In all events, whether our possible inference is correct or not, we have no doubt that with the confused state of the record, the shifting of position by petitioner, the lack of corroboration as to essential details, the admitted lack of independent recollection, the failure to make or preserve contemporaneous records, and the lack of any effort on petitioner's part to gather confirmatory data, even in 1945 when he knew he was going to claim a deduction for tax purposes, we must reach the conclusion that petitioner's case was "not proved," or, in other words, that he has failed to overcome the presumption of correctness attending respondent's determination. If this view has the effect of making petitioner a victim of unforunate circumstance, we can only say that it is clear that he himself has made the major contributions which have led to this result. In view of the conclusion we have reached, it is unnecessary to consider the other contentions asserted by the parties. Decision will be entered for the respondent. ↩